## NATIONAL INVESTORS CORPORATION v. HOEY.

### No. 384.

Circuit Court of Appeals, Second Circuit.
July 13, 1944.

Before L. HAND, SWAN, and FRANK, Circuit Judges.

Samuel Rudykoff, of New York City, for appellant.

John A. Reed, of New York City, for appellee.

L. HAND, Circuit Judge.

The defendant appeals from a judgment against her for corporate income and excess profit taxes alleged to have been wrongfully collected by her testator from the plaintiff, for the year 1935. The case was tried to a judge on stipulated facts; the substance of which was as follows. The plaintiff, a New York corporation whose principal business was that of "an investment trust," in 1931 caused a corporation known as the National Investors Fund, Inc., to be organized under the laws of Delaware. This company issued no shares until December 17, 1934, had no assets or liabilities, and conducted no business. The plaintiff was the owner of a number of shares of common stock and "warrants for the purchase of shares" in three of its subsidiaries, called the Second, Third and Fourth National Investors Corporations. The plaintiff wished to unite itself and these four subsidiaries into a single corporation, and, as a preliminary step, on December 17, 1934, it transferred its holdings in the three subsidiaries to the Investors Fund in exchange for ten shares of that company's stock. The transferee received in May and in August of 1935 dividends, aggregating about $19,000, from the transferred shares, which sum, less $10 for the Delaware franchise tax, it declared and paid as dividends upon the ten shares held by the plaintiff. It also declared and issued to the plaintiff a stock dividend of 100% (10 shares) on December 7, 1935. Thus on that day the Investors Fund had issued twenty shares of its own stock to the plaintiff in exchange for the assets of the plaintiff's three subsidiaries which on December 17, 1934, the day of their transfer, had been worth $4,660,233.40.

The proposal to unite into a single corporation the plaintiff and the Second, Third and Fourth National Investors Corporations, was submitted to the stockholders on December 20, 1934; but after extended

consideration, the shareholders rejected it, and the "Plan," as it was called, was abandoned. The plaintiff then decided to liquidate the Investors Fund, and began to do so on December 21, 1935, by surrendering two of the twenty shares of that company in exchange for one-tenth of the assets it had transferred on December 17, 1934. The value of the transferred assets had on that day fallen to $2,361,681.30; but it limited itself in 1935 to the realization of only one-tenth of its loss, because it wished to realize in that year only so much as it could use to set off its gains from other sources. In January, 1936, it surrendered the other eighteen shares for the remaining assets of the Investors Fund, and thus completed the liquidation of that company. The issue is whether the plaintiff should be allowed as a deduction from its 1935 income the difference between the value, on December 17, 1934—$466,023.34—of one-tenth of the shares transferred to Investors Fund and the value on December 21, 1935—$236,168.-13. The Commissioner refused to allow the deduction and the plaintiff paid to the defendant's testator the tax imposed upon its income, as so computed.

This result depends upon whether, in the situation just disclosed, we should recognize transactions of sale or exchange between a corporation and its sole shareholder; and our decision turns upon three decisions of the Supreme Court: Burnet v. Commonwealth Improvement Company, 287 U.S. 415, 53 S.Ct. 198, 77 L.Ed. 399; Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406, and Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 63 S. Ct. 1132, 87 L.Ed. 1499. In the first of these the question was whether it was proper to tax a corporation for profits upon transactions between itself and a decedent's estate which owned all its shares. The court merely declared that, since a corporation was for most purposes recognized as a separate jural person, and since the situation was not one of the exceptions where the "corporate form" should be "disregarded," it should be taxed upon its gains, regardless of the fact that no living person had gained or lost a cent. When Higgins v. Smith, supra, was before us (Smith v. Higgins, 2 Cir., 102 F.2d 456) we assumed that this rule held good in a case where the Commissioner had refused to allow a deduction to the sole shareholder of losses sustained in transactions between him and his corporation. In this we were in error, however, for the Supreme Court held that, although the Treasury might insist upon the separate personality of the corporation when it chose, it might also disregard it, when it chose. It explained Burnet v. Commonwealth Improvement Co., supra, 287 U.S. 415, 53 S.Ct. 198, 77 L.Ed. 399, by saying that "a taxpayer is free to adopt such organization of his affairs as he may choose and having elected to do some business as a corporation, he must accept the tax disadvantages.

"On the other hand, the Government may not be required to acquiesce in the taxpayer's election of that form for doing business which is most advantageous to him. The Government may look at actualities and upon determination that the form employed of doing business or carrying out the tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. * * * It is command of income and its benefits which marks the real owner of property." [308 U.S. 473, 60 S.Ct. 358, 84 L.Ed. 406.] This language we later interpreted as meaning that "the Treasury may take a taxpayer at his word, so to say; when that serves its purpose, it may treat the corporation as a separate person from himself; but that is a rule which works only in the Treasury's own favor; it cannot be used to deplete the revenue." United States v. Morris & Essex R. Co., 2 Cir., 135 F.2d 711, 713. Again we were wrong; we neglected to observe that the corporate "form" must be "unreal or a sham," before the Treasury may disregard it; we had taken too literally the concluding language that it was the "command of income and its benefits which marks the real owner of property."

This error was made plain in the third decision of the Supreme Court—Moline Properties, Inc. v. Commissioner, supra, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499. In that case the question was whether the corporation might insist upon the Treasury's including capital gains within the gross income of its sole shareholder, and the court decided that it might not. That was the same situation as existed in Burnet v. Commonwealth Improvement Co., supra, 287 U.S. 415, 53 S.Ct. 198, 77 L.Ed. 399. The gloss then put upon Higgins v. Smith, supra, was deliberate and is authoritative: it was that, whatever the purpose of organizing the corporation, "so long as that purpose is the equivalent of

business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity." 319 U.S. 439, 63 S.Ct. 1134, 87 L.Ed. 1499. That, as we understand it, is the same interpretation which was placed upon corporate reorganizations in Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355, and which has sometimes been understood to contradict the doctrine that the motive to avoid taxation is never, as such, relevant. In fact it does not trench upon that doctrine; it merely declares that to be a separate jural person for purposes of taxation, a corporation must engage in some industrial, commercial, or other activity besides avoiding taxation: in other words, that the term "corporation" will be interpreted to mean a corporation which does some "business" in the ordinary meaning; and that escaping taxation is not "business" in the ordinary meaning.

 If the law be so understood, it seems to us that the plaintiff at bar has not proved that it was entitled to the deduction. Although the Investors Fund was a mere shell until December 17, 1934, when it was used as a means of putting through the consolidation of the four other companies under the "Plan," that was a "business" activity, in the sense that we have just defined that word. So was holding the transferred securities, while the "Plan" was being considered by the shareholders. However, although the stipulation declares that the "Plan" was submitted to the shareholders on December 20, 1934, and was rejected, it does not tell us when the rejection took place, or why the plaintiff waited for almost the whole year 1935 before liquidating the company. The plaintiff has the burden of proving how much of the money which the defendant's testator collected, he had no right to collect, and upon this record we cannot tell how much that was, or, for that matter, whether any part of it was wrongfully collected. The deduction of any loss arising out of the acquisition and later surrender by the plaintiff of the two shares in the Investors Fund required the plaintiff to prove both the "basis"—the cost—of the shares, and the "amount realized." The plaintiff did prove the "basis": i. e. the value of one-tenth of the securities transferred to the Investors Fund on December 17, 1934; but it did not prove the "amount realized," (§ 111(b) of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev. Code, § 111(b)), for it by no means followed that the value of the securities on December 21, 1935 (although that was in fact the day when the securities were returned to the plaintiff), was the controlling value.

The reason upon this record why we cannot accept the value on that day is that, although the original acquisition of the shares was a part of a "business" activity, as was their subsequent retention until the "Plan" was rejected, as soon as that happened, any continued retention of the securities longer than was necessary for liquidation, was not a "business" activity, as, indeed, the plaintiff itself recognized by proceeding to liquidate. Any decrease in the value of the securities until the shareholders rejected the "Plan," and for a reasonable time thereafter, the plaintiff might count as part of its loss—it was not bound to begin liquidation on the very day of the rejection. But any decrease thereafter it was not entitled to include, for the whole purpose of acquiring the shares was to put through the "Plan," and when that was known to be impossible, there was no longer any "business" for the Investors Fund to do. That any later decreases should not be "recognized" is the inevitable corollary of the doctrine that the Treasury may disregard transactions with a wholly owned corporation, not engaged in any "business" activity.

We could indeed enter final judgment dismissing the complaint because of this failure of proof; but it seems to us that that would be an unjust disposition of the controversy. It is entirely possible that the greater part of the depreciation of the shares was between December 17, 1934, and the date when plaintiff fell under a duty to "liquidate" the Investors Fund; it is indeed possible that the whole loss took place in that period. It is as right that the Treasury should not keep what it has mistakenly collected, as that it should collect its due. While therefore the judgment must be reversed, a new trial will be ordered, at which the plaintiff will have an opportunity to supply that evidence which was lacking upon the first.

Judgment reversed; new trial ordered.